FILED

November 1, 2016

IN COURT OF
WORKERS' COMPENSATION
CLAIMS

Time 7:50 AM



## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT MURFREESBORO

| | | |
|---|---|---|
| **TERRY ROHRENBACH** | ) | **Docket No.: 2015-05-0600** |
| **Employee,** | ) | |
| **v.** | ) | **State File Number: 74548-2015** |
| **YATES SERVICES** | ) | |
| **Employer,** | ) | **Judge Dale Tipps** |
| **And** | ) | |
| **TRAVELERS INS.** | ) | |
| **Insurance Carrier.** | ) | |
| | ) | |

## COMPENSATION HEARING ORDER

This matter came before the undersigned Workers' Compensation Judge on October 19, 2016, for a Compensation Hearing pursuant to Tennessee Code Annotated section 50-6-239 (2015). The central legal issues are: (1) whether the employee, Terry Rohrenbach, suffered an injury arising primarily out of and in the course and scope of his employment with the employer, Yates Services; (2) whether Mr. Rohrenbach is entitled to temporary disability benefits, and if so, in what amount; (3) whether Mr. Rohrenbach is entitled to permanent disability benefits; and (4) whether Mr. Rohrenbach is entitled to past or future medical benefits.[1] For the reasons set forth below, the Court finds that Mr. Rohrenbach established by a preponderance of the evidence that he sustained an injury primarily arising out of and in the course and scope of his employment with Yates. Accordingly, the Court finds that Mr. Rohrenbach is entitled to medical benefits, temporary disability benefits, and permanent partial disability benefits.

### History of Claim

Mr. Rohrenbach has worked as a Yates employee at the Nissan plant in Smyrna for several years. He testified he never had any problems or symptoms with his left shoulder until September 13, 2015, while working on the assembly line in the "Right-Hand Front Member" station. On that date, he reached up to take a hood ledge off the

---

[1] A complete listing of the technical record and exhibits admitted at the Compensation Hearing is attached to this Order as an appendix.

1

top of a stack of parts and felt a sharp pain in his left shoulder. He was unable to lift his arm above chest level. He gave notice to his supervisor, who took him to the medical department.

Mr. Rohrenbach selected Premise Health, an onsite provider at Nissan, from a physician panel on September 14, 2015. (Ex. 5 at 4.) He saw Robert Dickinson, an advanced practice nurse, on that date for complaints of left shoulder pain. Mr. Rohrenbach reported, "I was loading hood ledge and reached for a part and couldn't raise my arm." APN Dickinson also noted:

> EE denies any slip, trip or fall but did state that he spread decorative gravel in his yard for three hours and he did take frequent breaks. Rates pain on a 0 to 9 scale at 7. The pain is described as aching and stabbing/jabbing. The symptoms are reported as varying and intermittent. Reports improvement with self care including ice and OTC meds. Symptoms are reported to be worsened by certain motions.

He examined Mr. Rohrenbach, assessed a shoulder sprain, and prescribed Advil and Tylenol. (Ex. 4 at 19.)

Mr. Rohrenbach returned to the clinic and saw Dr. Woodall on September 17, 2015. He reported a rapid onset of left shoulder weakness and pain while reaching for a part. Dr. Woodall assessed Mr. Rohrenbach's range of motion and concluded, "Idiopathic degenerative shoulder – believe is impingement (hypertrophy and spur) with probable supraspinatus tear – not primarily related to work activities." He prescribed ibuprofen and restricted movement of the left arm. *Id.* at 21. Yates denied Mr. Rohrenbach's claims as idiopathic on October 1, 2015. (Ex. 5 at 5.)

Mr. Rohrenbach subsequently sought treatment at a walk-in clinic, which referred him to Dr. James Rungee. Mr. Rohrenbach saw Dr. Rungee on October 26, 2015. He described his problem to Dr. Rungee and told him his employer denied his workers' compensation claim because he had degenerative changes. Dr. Rungee ordered an MRI, which showed a full-thickness tear of the rotator cuff, for which Dr. Rungee recommended surgical repair. (Ex. 4 at 65-73.)

Dr. Rungee performed a repair and debridement of the rotator cuff tear on December 8, 2016. *Id.* at 84. On January 15, 2016, Mr. Rohrenbach requested a full-duty release so that he could go back to work. Dr. Rungee declined to do this, pointing out that Mr. Rohrenbach needed to continue his physical therapy. When Mr. Rohrenbach returned on February 22, Dr. Rungee noted, "He is doing quite well. He says he is having no pain or discomfort. He has not been able to return to work, but feels ready to do such." Dr. Rungee released Mr. Rohrenbach to full duty but instructed him to return if he had any problems. *Id.* at 95, 102.

Mr. Rohrenbach underwent an independent medical evaluation with Dr. C. M. Salekin on July 27, 2016. After reviewing medical records and performing a physical examination, Dr. Salekin noted Mr. Rohrenbach complained of significant pain and weakness. He complained he could not raise his arm above his shoulder due to his pain, and he reported extreme difficulty with pushing, pulling, and lifting with his left arm. Dr. Salekin assigned a 7% upper extremity impairment rating for full thickness rotator cuff tear (default class 1, grade modifier 2) and a 5% impairment for Type II acromion and coracoacromial ligament fraying (default class 1, grade modifier 2). Combined, these translated to a 7% whole person rating. *Id.* at 198-200.

The parties deposed several medical providers in this matter, beginning with Dr. Rungee, a board-certified orthopedic surgeon. After Mr. Rohrenbach's attorney provided a detailed description of the actions performed by employees in the Right-Hand Front Member station, he asked:

Q: [I]s that consistent with a traumatic work injury?

A: Yeah. I would say that's consistent.

Q: If that history is to be believed, is it more likely than not that his injury primarily arose out of his work?

A: I don't have any reason to doubt his story. But that's all I have to go on is what he told me. But his description is consistent with a means of tear in your rotator cuff.

(Ex. 3 at 11-13.)

Dr. Rungee went on to testify that Mr. Rohrenbach retained no permanent impairment under the Sixth Edition of the American Medical Association's Guides to the Evaluation of Permanent Impairment (AMA Guides). He explained that, under the Guides, "if you have a repaired rotator cuff and have no symptoms, then it's a zero percent impairment." *Id.* at 9-10.

Dr. Rungee was also asked about Mr. Rohrenbach's medical expenses. Although he did not have a copy of the other providers' invoices, he testified that the treatment Mr. received was necessary and that his charges were customary and ordinary charges for the community. *Id.* at 13-15. He also said Mr. Rohrenbach would not have been able to return to his regular job for three months after his surgery. *Id.* at 15-16.

The next doctor to be deposed was Dr. Woodall, who testified that he is a board-certified specialist in occupational medicine. His employer, Premise Health, contracts

3

with Nissan to provide on-site medical services for Nissan and Yates employees. (Ex. 1 at 7-8.) Dr. Woodall testified Mr. Rohrenbach's injury was not primarily related to his work because:

> The basis is that shoulders as a group are primary idiopathic and degenerative. The most strongest [sic] observed factor in the literature for rotator cuff issues is age. It predominately occurs in the late 40s, early 50s. It is increased in the instance for people that work for long periods with their arms up above their head or with heavy loads over their head or with outstretched arms. His work was described as fairly light and generally below chest level. In addition, he also has a history of being a golfer and a fisherman. Both are sports in which they also have an increased instance of rotator cuff issues.

*Id*. at 15.

On cross-examination, Dr. Woodall acknowledged that Mr. Rohrenbach performed approximately 480 outstretched, overhead movements per day in his work. He also stated that, other than tendinosis and some cystic changes, the October 2015 MRI did not indicate degeneration in Mr. Rohrenbach's shoulder. *Id*. at 23-24.

The parties deposed Dr. Salekin on August 29, 2016. Regarding causation, he testified at length about the types of motion Mr. Rohrenbach performed in his work and the effect of those motions on various parts of the shoulder. He then concluded, "From a reasonable degree of medical certainty, I believe work-related repetitive activity was the main and primary cause of the injury to his rotator cuff." (Ex. 2 at 17-19.) He also confirmed his opinion that Mr. Rohrenbach retained a 7% upper extremity impairment rating for full thickness rotator cuff tear and a 5% impairment for Type II acromion and coracoacromial ligament fraying, resulting in a 7% whole person rating. *Id*. at 19-20.

On cross-examination, Dr. Salekin disagreed that Mr. Rohrenbach had made a complete recovery and testified that, in addition to Mr. Rohrenbach's complaints of pain, he had an impaired range of motion. He admitted, however, that he did not know Mr. Rohrenbach's condition on the day Dr. Rungee returned him to work without restrictions. *Id*. at 48-52. He went on to testify that he based his impairment opinion on diagnostic criteria set out in the Guides. Therefore, the impairment was based on the diagnosis given by Mr. Rohrenbach's doctors, as well as his pain, weakness, and restricted range of motion. *Id*. at 58-59.

Mr. Rohrenbach filed a Petition for Benefit Determination (PBD). The parties did not resolve the disputed issues through mediation, and the Mediating Specialist filed a Dispute Certification Notice (DCN).

4

At the Compensation Hearing, Mr. Rohrenbach asserted he is entitled to medical treatment, temporary disability benefits, and permanent disability benefits for injuries to his left shoulder arising primarily out of and in the course and scope of his employment. Specifically, he argued his was an extremely repetitive job with many reaching movements. He relied on Dr. Rungee's opinion that his injury is consistent with an overuse injury and Dr. Salekin's causation opinion to rebut the statutory presumption of correctness attached to the causation opinion of Dr. Woodall.

Regarding that opinion, Mr. Rohrenbach argued that Dr. Woodall's method and conclusions are suspect because they are based on his opinion that rotator cuff injuries after a certain age are primarily degenerative. Mr. Rohrenbach contended this would effectively exclude shoulder injury claims by persons over forty-five years of age. Further, he noted that Dr. Woodall only generally cited "literature" in support of this opinion and failed to provide any specific studies or authority. Finally, Mr. Rohrenbach objected to Dr. Woodall's generalization about causation and pointed out his injury did not occur in a vacuum, but happened after a significant number of repetitive shoulder actions. The fact that he might be more prone to injury is not dispositive, as Yates must take him as it finds him.

Mr. Rohrenbach contended he was entitled to temporary total disability benefits for the period of October 23, 2015, his first day off work, through February 22, 2016, the date Dr. Rungee released him at MMI. He also requested payment of the medical bills made an exhibit to Dr. Rungee's deposition, reimbursement of a $1000.00 payment he personally made to Dr. Rungee as a surgery deposit, and a panel of three physicians for future treatment.

Yates countered that Mr. Rohrenbach is not entitled to any workers' compensation benefits. It contended he failed to meet his burden of proving compensability because the opinions of Drs. Rungee and Salekin are is insufficient to overcome the statutory presumption afforded Dr. Woodall's opinion.

Yates argued that Mr. Rohrenbach mischaracterized Dr. Woodall's testimony. It contended he really just said that a person over forty-five years of age would typically have degenerative changes in the shoulder – exactly what the doctors found in Mr. Rohrenbach. What Dr. Woodall said is, that in this particular case, a man with degenerative changes reached out – he did not lift anything or reach overhead – and this event was not the primary cause of his injury.

Yates disputed Dr. Rungee's opinion that reaching out was the cause of Mr. Rohrenbach's injury because Dr. Rungee did not have all the relevant medical history. He based his opinion strictly upon what Mr. Rohrenbach told him and did not review any other medical records.

5

As to Dr. Salekin, Yates contended that his opinion is not entitled to any weight whatsoever, particularly on the issue of permanent impairment. Yates first pointed out that Dr. Salekin was retained solely to provide an independent evaluation and impairment rating. It also questioned Mr. Rohrenbach's description of his condition at the time he saw Dr. Salekin, because he exhibited no pain or reduced range of motion at his last visit with Dr. Rungee.

Yates further questioned Dr. Salekin's competency because he "keeps awful records." Yates was referring to an incident during Dr. Salekin's deposition where records from another patient were included in his packet of Mr. Rohrenbach's medical records. It also questioned whether Dr. Salekin, a neurologist, was a reliable source of an orthopedic impairment opinion.

Yates additionally challenged the basis of Dr. Salekin's rating in the AMA Guides. He based his rating in part on Mr. Rohrenbach still having pain at the time Dr. Rungee released him. Yates argued that this is inaccurate and, as a result, Dr. Salekin utilized the wrong part of the Guides. Dr. Rungee noted Mr. Rohrenbach to be pain-free and had no objective findings at the time of MMI, which results in no impairment rating. Yates argued that it was improper for Dr. Salekin to rely on Mr. Rohrenbach's complaints of pain five months after that release. It also questioned why, if Mr. Rohrenbach had pain after returning to work, he never returned to Dr. Rungee for treatment, but went to Dr. Salekin for an IME.

In the event the Court were to find Mr. Rohrenbach's injury to be compensable, Yates contended that Dr. Rungee's impairment opinion is more credible than that of Dr. Salekin, which means Mr. Rohrenbach is not entitled to any permanent disability benefits. It suggested that the correct beginning date for any temporary disability benefits would be October 26, 2015, the date Mr. Rohrenbach first saw Dr. Rungee.

Yates argued Mr. Rohrenbach's medical bills are not recoverable because Dr. Rungee did not review any of medical bills he was asked about during his deposition. Thus, Mr. Rohrenbach has not met his burden of proving the bills were reasonable and necessary.

**Findings of Fact and Conclusions of Law**

The following legal principles govern this case. Mr. Rohrenbach has the burden of proof on all essential elements of his claim. *Scott v. Integrity Staffing Solutions,* No. 2015-01-0055, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Tenn. Workers' Comp. App. Bd. Aug. 18, 2015). "[A]t a compensation hearing where the injured employee has arrived at a trial on the merits, the employee must establish by a preponderance of the evidence that he or she is, in fact, entitled to the requested benefits." *Willis v. All Staff*, No. 2014-05-0005, 2015 TN Wrk. Comp. App. Bd. LEXIS 42, at *18 (Tenn. Workers'

Comp. App. Bd. Nov. 9, 2015); *see also* Tenn. Code Ann. § 50-6-239(c)(6) (2015) ("[T]he employee shall bear the burden of proving each and every element of the claim by a preponderance of the evidence."). In analyzing whether Mr. Rohrenbach met his burden, the Court will not construe the law remedially or liberally in his favor, but instead must construe the law fairly, impartially, and in accordance with basic principles of statutory construction favoring neither Mr. Rohrenbach nor Yates. *See* Tenn. Code Ann. § 50-6-116 (2015).

*Compensability*

Mr. Rohrenbach's burden includes proving his injury arose primarily out of and occurred in the course and scope of his employment. Tenn. Code Ann. § 50-6-102(14) (2015). To do so, he must show his injury was "caused by a specific incident, or set of incidents, arising primarily out of and in the course and scope of employment, and is identifiable by time and place of occurrence." Tenn. Code Ann. § 50-6-102(14)(A) (2015). Further, he must show, "to a reasonable degree of medical certainty that it contributed more than fifty percent (50%) in causing the . . . disablement or need for medical treatment, considering all causes." Tenn. Code Ann. § 50-6-102(14)(C) (2015).

Applying these principles to the facts of this case, the Court finds Mr. Rohrenbach met his burden of establishing a specific incident or set of incidents, identifiable by time and place of occurrence. He testified, without contradiction, that he performed a highly repetitive job and, while reaching out and up in the course of that job, he suffered a sudden onset of pain in his shoulder.

Turning to the issue of whether the injury arose primarily out of the incident or set of incidents, as noted above, the medical testimony was contradictory. Dr. Woodall, as the parties agree, was selected from a panel provided by Yates. Therefore, Tennessee Code Annotated section 50-6-102(14)(E) (2015) establishes a rebuttable presumption of correctness for Dr. Woodall's causation opinion. Longstanding Tennessee caselaw provides:

> When the medical testimony differs, the trial judge must obviously choose which view to believe. In doing so, he is allowed, among other things, to consider the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information by other experts.

*Orman v. Williams Sonoma, Inc.*, 803 S.W.2d 672, 676 (Tenn. 1991).

After carefully reviewing the medical testimony, the Court finds the preponderance of the medical proof is sufficient to overcome the presumption of correctness attached to Dr. Woodall's opinion. Although he opined that Mr.

7

Rohrenbach's condition did not arise primarily out of his employment, Dr. Woodall's opinion was somewhat general in nature, and he provided very little individual justification for his opinion. Instead, he noted that "shoulders as a group are primary idiopathic and degenerative," and the "strongest observed factor *in the literature* for rotator cuff issues is age." Other than the fact that Mr. Rohrenbach fell into to the applicable age bracket, Dr. Woodall did little to explain why Mr. Rohrenbach's repetitive work was not the primary cause of his particular injury. This is especially true in light of his admission that the October 2015 MRI showed little degeneration in Mr. Rohrenbach's shoulder. Further, although he testified that the incidence of rotator cuff problems is increased in people who work for long periods with their arms up above their head or with outstretched arms, he failed to explain why this risk factor would not apply to Mr. Rohrenbach, who he acknowledged performed approximately 480 outstretched overhead movements per day in his work.

Dr. Rungee's testimony, while relevant to the issue of causation, was incomplete. He failed to respond directly to counsel's question of whether the injury arose primarily out of Mr. Rohrenbach's work. Instead, he testified that Mr. Rohrenbach's description of his work duties was "consistent with a means of" a rotator cuff tear.

Dr. Salekin opined that Mr. Rohrenbach's work-related repetitive activity was the main and primary cause of the injury to his rotator cuff. Although Yates raised a number of objections to Dr. Salekin's testimony, most of those were directed at his impairment opinion. The objections to his causation opinion were his alleged bias, his competency to keep proper records, and whether he received an accurate history from Mr. Rohrenbach.

The Court is not persuaded by these objections and finds that Dr. Rungee's testimony effectively mitigates any likelihood of bias by Dr. Salekin. Although Dr. Rungee's opinion is, by itself, insufficient to establish legal causation, it still constitutes the opinion of a treating surgeon that Mr. Rohrenbach's injury was consistent with the work duties and event he described. As to the history Mr. Rohrenbach gave Dr. Salekin, the Court had an opportunity to observe Mr. Rohrenbach as he testified and demonstrated his problems with shoulder mobility. The Court finds that he appeared steady, forthcoming, and honest, which characteristics, according to the Tennessee Supreme Court, are indicia of reliability. *See Kelly v. Kelly,* 445 S.W.3d 685, 694-695 (Tenn. 2014). Finally, after reading the deposition transcript, the Court is unpersuaded that the additional medical records found in Dr. Salekin's file are sufficient to find that his record-keeping was so deficient as to invalidate his causation opinion, especially as no proof was presented to show that he failed to review the relevant medical records in formulating his opinion.

Yates suggested the history given in APN Dickinson's notes of Mr. Rohrenbach "spreading decorative gravel" is indicative of the real cause of his injury. This argument is unpersuasive. Mr. Rohrenbach and his girlfriend testified credibly at trial that he had

not spread any gravel. More importantly, there is no medical opinion that the alleged gravel spreading was the cause of Mr. Rohrenbach's rotator cuff tear. This is not surprising when, on the day he reported the injury, he spent several hours performing his work without problem before the onset of his symptoms. Further, the record in question contains the following: "The symptoms are described as varying and intermittent. Reports improvement with self care [sic] including ice and OTC meds." These statements are totally at odds with the undisputed description of an onset of symptoms followed soon thereafter by a visit to the onsite clinic. This discrepancy raises questions about the reliability of the notation about gravel spreading.

*Entitlement to Medical Benefits*

Having found Mr. Rohrenbach sustained a compensable injury, the Court turns to the issue of entitlement to medical benefits. Under the Workers' Compensation Law, "the employer or the employer's agent shall furnish, free of charge to the employee, such medical and surgical treatment . . . made reasonably necessary by accident[.]" Tenn. Code Ann. § 50-6-204(a)(1)(A) (2015). "The injured employee shall accept the medical benefits . . . provided that in any case when the employee has suffered an injury and expressed a need for medical care, the employer shall designate a group of three (3) or more independent reputable physicians . . . from which the employee shall select one (1) to be the treating physician." Tenn. Code Ann. § 50-6-204(a)(3)(A)(i) (2015).

Although Mr. Rohrenbach chose to treat with Dr. Rungee and expressed satisfaction with his treatment, he did not seek to have Dr. Rungee designated as his authorized treating physician. Instead, he requested a panel of physicians. The Court finds he is entitled to this panel and continued medical treatment, pursuant to section 50-6-204.

Regarding Mr. Rohrenbach's past medical expenses, the only bills submitted were those from Dr. Rungee's medical group, Tennessee Orthopedic Alliance. He testified as to the reasonableness and necessity of Mr. Rohrenbach's medical treatment generally, but admitted he had not reviewed any of the bills. (Ex. 3 at 14, 24-25.) Consequently, the Court has no evidence with which to conclude whether the medical expenses incurred by Mr. Rohrenbach were made reasonably necessary by his September 14, 2015 injury. Therefore, while Yates is responsible for paying for any reasonable and necessary medical treatment Mr. Rohrenbach underwent as a result of his compensable injury, the Court cannot determine the actual amount of those expenses. Mr. Rohrenbach's out-of-pocket deposit to Tennessee Orthopedic Alliance is undisputed and he is entitled to reimbursement for that expense.

*Temporary Disability Benefits*

An injured worker is eligible for temporary total disability (TTD) benefits if: (1) the worker became disabled from working due to a compensable injury; (2) there is a causal connection between the injury and the inability to work; and (3) the worker established the duration of the period of disability. *Jones v. Crencor Leasing and Sales*, No. 2015-06-0332, 2015 TN Wrk. Comp. App. Bd. LEXIS 48, at *7 (Tenn. Workers' Comp. App. Bd. Dec. 11, 2015) (citing *Simpson v. Satterfield*, 564 S.W.2d 953, 955 (Tenn. 1978)). The only proof submitted regarding a period of total disability was Dr. Rungee's testimony that Mr. Rohrenbach would have been completely off work for a week after his surgery. Thus, it appears the bulk of Mr. Rohrenbach's temporary disability claim is actually for temporary partial disability.

Temporary partial disability benefits, a category of vocational disability distinct from temporary total disability, are available when the temporary disability is not total. *Id.; see also* Tenn. Code Ann. § 50-6-207(1)-(2) (2015). Specifically, "[t]emporary partial disability refers to the time, if any, during which the injured employee is able to resume some gainful employment but has not reached maximum recovery." *Id.* (citing *Williams v. Saturn Corp.*, No. M2004-01215-WC-R3-CV, 2005 Tenn. LEXIS 1032, at *6 (Tenn. Workers' Comp. Panel Nov. 15, 2005)). Thus, in circumstances where the treating physician has released the injured worker to return to work with restrictions prior to maximum medical improvement, and the employer either (1) cannot return the employee to work within the restrictions or (2) cannot provide restricted work for a sufficient number of hours and/or at a rate of pay equal to or greater than the employee's average weekly wage on the date of injury, the injured worker may be eligible for temporary partial disability. *Id.*

Dr. Rungee testified that, during Mr. Rohrenbach's post-surgical convalescence, he would have been restricted and unable to perform his regular job. There was no evidence indicating that Yates offered Mr. Rohrenbach any work within his restrictions during this time. Thus, he qualified for temporary partial disability benefits until Dr. Rungee released him at MMI. In combination with the week of total disability, Mr. Rohrenbach is entitled to temporary disability benefits for the period of December 8, 2015 (the date of his surgery), through February 22, 2016.[2] At the stipulated compensation rate of $463.99, this constitutes eleven weeks of benefits, or $5103.89.

*Permanent Partial Disability Benefits*

Permanent Partial Disability benefits are owed when an employee sustains a permanent impairment from a work injury but is still able to work. "In case of disability

_____

[2] Although Mr. Rohrenbach maintained he was entitled to temporary disability benefits beginning in October 2015, Dr. Rungee's records do not address restrictions during that time, and Mr. Rohrenbach offered no medical evidence of any other temporary disability benefit period.

partial in character but adjudged to be permanent, at the time the injured employee reaches maximum medical improvement the injured employee shall be paid sixty-six and two-thirds percent (66 2/3%) of the employee's average weekly wages for the period of compensation, which shall be determined by multiplying the employee's impairment rating by four hundred fifty (450) weeks." Tenn. Code Ann. § 506-207(3)(A) (2015).

As noted above, the Court admitted two medical impairment ratings into evidence in this case. Both Dr. Rungee and Dr. Salekin used the same table from the AMA Guides, Table 15-5, when rendering their respective impairment ratings. Mr. Rohrenbach disputed Dr. Rungee's conclusion that the AME Guides mandate a zero percent impairment based upon an absence of symptoms following the surgery. Mr. Rohrenbach argued this is incorrect because, as soon as he returned to work, his shoulder became painful and restricted in its range of motion. Yates, on the other hand, argued Dr. Rungee's rating was more accurate than that of Dr. Salekin, who based his rating on complaints of pain five months after MMI.

The Court shares Yates' concerns about Mr. Rohrenbach's failure to return to Dr. Rungee when his symptoms returned, but is unaware of any authority in the statute, case law, or AMA Guides that limits the evaluation of an impairment rating solely to the date of MMI. Further, Yates could have requested Mr. Rohrenbach return to Dr. Rungee for an examination or asked Dr. Rungee about the propriety of a rating five months after MMI. Insofar as the Court found Mr. Rohrenbach's description of his current condition to be credible, it must find that Dr. Rungee's rating is improper.

Turning to Dr. Salekin's rating, Yates disputes the accuracy of his opinion that Mr. Rohrenbach retained a 7% upper extremity impairment rating for full thickness rotator cuff tear and a 5% impairment for Type II acromion and coracoacromial ligament fraying, resulting in a 7% whole person rating. As a result, the Court carefully reviewed Dr. Salekin's deposition and notes that he did not provide any explanation as to why he felt it was appropriate to include both diagnoses in his rating.

The AMA Guides provides that "[m]ost impairment values for the upper extremity are calculated using the diagnosis-based impairment (DBI) method." Am. Med. Ass'n, Guides to the Evaluation of Permanent Impairment at 385. This method calls for the examiner to determine the impairment class, based upon the diagnosis, before modifying that class using modifiers such as functional history or physical examination. The Guides specify that, "In most cases only one diagnosis will be appropriate. If a patient has 2 significant diagnoses, for instance, rotator cuff tear and biceps tendonitis, the examiner should use the diagnosis with the highest causally-related impairment rating for the impairment calculation." Id. at 387. Instructions for shoulder evaluation include the following:

In the shoulder, it is not uncommon for rotator cuff tears, a superior labrum

11

from anterior to posterior (SLAP) lesion or other labral lesions, and biceps tendon pathology to all be present simultaneously. The evaluator is expected to choose the most significant diagnosis and to rate only that diagnosis using the DBI method that has been described. If clinical studies confirm more than 1 of the following symptomatic diagnoses . . . the grade can be modified according to the Clinical Studies Adjustment Table.

*Id.* at 390.

Based on the above, the Court concludes that Dr. Salekin incorrectly included Mr. Rohrenbach's additional 5% rating for impairment for Type II acromion and coracoacromial ligament fraying. The Guides mandate that he should have utilized "the diagnosis with the highest causally-related impairment rating" – the 7% rating for rotator cuff tear, which converts to a 4% whole person rating. He could perhaps have then modified that rating according to the Clinical Studies Adjustment Table, but there is no evidence he did so. The Court therefore adopts his rotator cuff rating and finds Mr. Rohrenbach suffered 4% impairment to the body from his compensable work-related injury.

**IT IS, THEREFORE, ORDERED** as follows:

1. Yates shall provide Mr. Rohrenbach with medical treatment made reasonably necessary by the September 2, 2014 injury and in accordance with Tennessee Code Annotated section 50-6-204 (2015), to be initiated by Employer or its workers' compensation carrier providing Employee with a panel of physicians as required by that statute.

2. Yates shall pay any of Mr. Rohrenbach's past medical expenses that were made reasonably necessary by the September 14, 2015 shoulder injury.

3. Yates shall reimburse Mr. Rohrenbach for his out-of-pocket medical expenses in the amount of $1000.00.

4. The stipulated compensation rate is $463.99 per week.

5. Yates shall pay Mr. Rohrenbach temporary total disability and partial disability benefits in the amount of $5103.89 for the period from December 8, 2015, through February 22, 2016.

6. Pursuant to Tennessee Code Annotated section 50-6-207(3) (2015), Yates shall pay Mr. Rohrenbach $8,351.82 in permanent partial disability benefits, which equates to 450 weeks times his impairment rating of 4%.

7. The Court further finds Mr. Rohrenbach's counsel, Russell Thomas, provided good and valuable services to Mr. Rohrenbach in pursuit of his claim and is therefore entitled to recover a fee of twenty percent of his permanent and temporary disability award pursuant to Tennessee Code Annotated section 50-6-226 (2015).

8. Costs of this cause of $150.00 are assessed against Yates pursuant to Tennessee Compilation Rules and Regulations 0800-02-21-.07 (2015), to be paid within five days of this order becoming final.

9. Yates shall prepare and file a statistical data form within ten business days of the date of this order, pursuant to Tennessee Code Annotated section 50-6-244 (2015).

10. After a Compensation Hearing Order entered by a Workers' Compensation Judge has become final in accordance with Tennessee Code Annotated section 50-6-239(c)(7) (2015), compliance with this Order must occur in accordance with Tennessee Code Annotated section 50-6-239(c)(9) (2015). The Insurer or Self-Insured Employer must submit confirmation of compliance with this Order to the Bureau by email to WCCompliance.Program@tn.gov no later than the fifth business day after this Order becomes final or all appeals are exhausted. Failure to submit the necessary confirmation within the period of compliance may result in a penalty assessment for non-compliance.

**ENTERED this the 1st day of November, 2016.**

_____

**Dale Tipps**
**Workers' Compensation Judge**

Right to Appeal:

Tennessee Law allows any party who disagrees with this Compensation Hearing Order to appeal the decision to the Workers' Compensation Appeals Board or the Tennessee Supreme Court. To appeal your case to the Workers' Compensation Appeals Board, you must:

1. Complete the enclosed form entitled: "Compensation Hearing Notice of Appeal."

2. File the completed form with the Court Clerk *within thirty calendar days* of the date the Workers' Compensation Judge entered the Compensation Hearing Order.

3. Serve a copy of the Compensation Hearing Notice of Appeal upon the opposing party.

**4.** The appealing party is responsible for payment of a **filing fee in the amount of $75.00.** Within ten calendar days after the filing of a notice of appeal, payment must be received by check, money order, or credit card payment. Payments can be made in person at any Bureau office or by United States mail, hand-delivery, or other delivery service. In the alternative, the appealing party may file an Affidavit of Indigency, on a form prescribed by the Bureau, seeking a waiver of the filing fee. The Affidavit of Indigency may be filed contemporaneously with the Notice of Appeal or must be filed within ten calendar days thereafter. The Appeals Board will consider the Affidavit of Indigency and issue an Order granting or denying the request for a waiver of the filing fee as soon thereafter as is practicable. **Failure to timely pay the filing fee or file the Affidavit of Indigency in accordance with this section shall result in dismissal of the appeal.**

5. The party filing the notice of appeal, having the responsibility of ensuring a complete record on appeal, may request, from the Court Clerk, the audio recording of the hearing for the purpose of having a transcript prepared by a licensed court reporter and filing it with the Court Clerk within fifteen calendar days of the filing of the Expedited Hearing Notice of Appeal. Alternatively, the party filing the appeal may file a joint statement of the evidence within fifteen calendar days of the filing of the Compensation Hearing Notice of Appeal. The statement of the evidence must convey a complete and accurate account of what transpired in the Court of Workers' Compensation Claims and must be approved by the workers' compensation judge before the record is submitted to the Clerk of the Appeals Board. *See* Tenn. Comp. R. & Regs. 0800-02-22-.03 (2015).

6. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Workers' Compensation Appeals Board, the appeal will be docketed and assigned to an Appeals Board Judge for review. At that time, a docketing notice shall be sent to the parties. Thereafter, the parties have fifteen calendar days to submit briefs to the Appeals Board for consideration. *See* Tenn. Comp. R. & Regs. 0800-02-22-.02(3) (2015).

**To appeal your case directly to the Tennessee Supreme Court, the Compensation Order must be final and you must comply with the Tennessee Rules of Appellate Procedure. If neither party timely files an appeal with the Appeals Board, this Order will become final by operation of law thirty calendar days after entry, pursuant to Tennessee Code Annotated section 50-6-239(c)(7).**

## APPENDIX

Exhibits:
1. Deposition Transcript of Dr. Gilbert Woodall
2. Deposition Transcript of Dr. C. M. Salekin
3. Deposition Transcript of Dr. James Rungee
4. Stipulated medical records with index
5. Stipulated exhibits with index
6. Deposition Transcript of Terry Rohrenbach
7. Deposition Transcript of Robert Dickinson
8. Mr. Rohrenbach's attendance printout

Technical Record:[3]
1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Request for Expedited Hearing
4. Employee's Pre-trial Brief
5. Employee's Amended Pre-trial Brief
6. Employee's Brief Supplement
7. Yates' Pre-trial Memorandum
8. Expedited Hearing Order
9. Initial Hearing Order

---

[3] The Court did not consider attachments to Technical Record filings unless admitted into evidence during the Compensation Hearing. The Court considered factual statements in these filings or any attachments to them as allegations unless established by the evidence.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Compensation Hearing Order was sent to the following recipients by the following methods of service on this the 1st day of November, 2016.

| Name | Certified Mail | Via Fax | Via Email | Service sent to: |
|---|---|---|---|---|
| D. Russell Thomas | | | X | russthomas@thethomaslawfirm.com |
| John R. Rucker, Jr. | | | X | jkropog@ruckerlaw.com |

_____

**PENNY SHRUM, COURT CLERK**
wc.courtclerk@tn.gov